IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| ROY H. LOMAS, SR., D/B/A ROY LOMAS CARPET CONTRACTOR, | : | No. 87 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellee | : | Court dated December 21, 2015 at No. |
| | : | 2391 EDA 2011 Affirming the Judgment |
| | : | of the Court of Common Pleas of |
| v. | : | Montgomery County, Civil Division, |
| | : | entered on August 16, 2011 at No. |
| | : | 2000-05929. |
| JAMES B. KRAVITZ, CHERRYDALE | : | |
| CONSTRUCTION CO., ANDORRA | : | ARGUED: March 8, 2017 |
| SPRINGS DEVELOPMENT, INC., AND | : | |
| KRAVMAR, INC., F/K/A EASTERN | : | |
| DEVELOPMENT ENTERPRISES INC., | : | |
| | : | |
| Appellants | : | |

**OPINION**

**JUSTICE BAER**                                    **DECIDED: September 28, 2017**

In this appeal, the Court is asked to determine whether a trial court erred by denying a motion to recuse the entire bench of the Court of Common Pleas of Montgomery County. Specifically, we consider whether the moving parties waived their recusal claim and, if not, whether the claim has merit. For the reasons set forth below, we hold that the recusal issue was untimely presented to the trial court and, thus, waived. Accordingly, we affirm the judgment of the Superior Court.

The relevant background underlying this matter, which now spans more than 25 years, can be summarized as follows. Appellant James B. Kravitz ("Kravitz") was the sole officer, director, and shareholder of several companies known as the Andorra

Group, which included Appellants Cherrydale Construction Company ("Cherrydale"), Andorra Springs Development, Incorporated ("Andorra Springs"), and Kravmar, Incorporated, which was formally known as Eastern Development Enterprises, Incorporated ("Eastern").[1] Kravitz also owned a piece of property known as the Reserve at Lafayette Hill ("Reserve"). Andorra Springs was formed to develop residential housing on sections of the Reserve. In 1993, Andorra Springs hired Cherrydale as the general contractor to build the homes on the Reserve. Eastern operated as the management and payroll company for the Andorra Group.

Appellee Roy H. Lomas, Sr., d/b/a Roy Lomas Carpet Contractor ("Lomas") is the proprietor of a floor covering company. On November 10, 1994, Cherrydale and Lomas entered into a contract which required Lomas to supply and install floor covering in the homes being built by Cherrydale. Soon thereafter, Cherrydale breached that contract by failing to pay $30,913 to Lomas. In January of 1995, Lomas demanded that Cherrydale submit Lomas' claim to binding arbitration as mandated by the parties' contract.

The parties arbitrated the matter, and a panel of arbitrators entered an interim partial award in favor of Lomas, finding that Cherrydale breached the parties' contract and violated the Contractor and Subcontractor Payment Act, 73 P.S. §§ 501-516. Following Kravitz's unsuccessful attempt to have the interim award vacated, the arbitrators issued a final award to Lomas in the amount of $200,601.61, which included the $30,913 that Cherrydale owed to Lomas for his unpaid work, as well as costs and fees. On September 10, 1998, judgment was entered against Cherrydale in the Court of Common Pleas of Montgomery County. Important to the issue before this Court,

---

[1] We will refer to Kravitz, Cherrydale, Andorra Springs, and Eastern collectively as "Appellants."

then-Attorney, now-Judge Thomas C. Branca, Esquire, represented Lomas throughout the arbitration proceedings.

Since the entry of judgment in 1998, Kravitz has actively prevented Lomas from collecting his arbitration award by, *inter alia*, transferring all of the assets out of Cherrydale to himself and other entities under his control and, as the Superior Court put it, through "his campaign of incessant use and abuse of our civil litigation processes."[2] *Lomas v. Kravitz*, 130 A.3d 107, 112 (Pa. Super. 2015). In March of 2000, Lomas commenced the instant action against Appellants. Then-Attorney Branca filed the complaint on behalf of Lomas. Lomas sought to pierce the corporate veil and to hold Kravitz personally liable for the debt Cherrydale owed to Lomas. Lomas also presented claims of fraud and fraudulent transfers under the Pennsylvania Uniform Fraudulent Transfers Act, 12 Pa.C.S. §§ 5101-5110. In terms of relief, Lomas asked that judgment be entered against Appellants in the amount of $200,601.61. He also requested interest, costs, punitive damages, and attorneys' fees.

In November of 2001, then-Attorney Branca was elected to serve as a judge on the Court of Common Pleas of Montgomery County. Prior to taking the bench, then-Judge-Elect Branca withdrew his appearance in the matter and referred the case to Lomas' current counsel from the law firm of Spector, Gadon, & Rosen ("SGR"). After several years of tedious litigation, the parties agreed to a bifurcated bench trial. The presiding judge was the Honorable Thomas P. Rogers of the Court of Common Pleas of Montgomery County. Based upon the parties' agreement, Judge Rogers first was tasked with determining whether Appellants were liable to Lomas. The second phase of

---

[2] The details of Kravitz's numerous actions which have thwarted Lomas from collecting his arbitration award are irrelevant to the disposition of the issues before the Court; thus, we will not delve into all of those details.

trial, if necessary, would require Judge Rogers to examine whether Appellants should be required to pay attorneys' fees and punitive damages to Lomas.

Appellants concede that, before trial began, the parties met with Judge Rogers to discuss whether it was appropriate for him to preside over the trial in light of now-Judge Branca's previous representation of Lomas. Appellants' Brief at 10. Appellants also concede that the parties agreed to allow Judge Rogers to decide the matter; however, as we discuss *infra*, Appellants maintain that, during these pre-trial proceedings, they were unaware of Judge Branca's continued financial interest in the outcome of the case and his continuing discussions with counsel from SGR regarding at least certain aspects of this case after he took the bench. *Id.* at 10-11.

The three-day liability trial was held from January 16, 2007, through January 18, 2007. After that trial, the parties submitted proposed findings of fact and conclusions of law. In July of 2007, Judge Rogers entered an order declaring that Appellants are liable to Lomas. Accordingly, a bench trial on attorneys' fees and punitive damages was scheduled to begin in September of 2007. The first day of the trial on attorneys' fees and punitive damages occurred on September 4, 2007. The second and last day of the trial was September 6, 2007. Judge Branca was Lomas' first witness to testify on September 6th.

The direct examination of Judge Branca was relatively brief and focused on the attorneys' fees for which Judge Branca billed Lomas when he represented Lomas in this matter. N.T., 9/6/2007, at 3-14. Toward the end of the direct examination, counsel for Lomas asked Judge Branca whether he has had any communications with Lomas' current counsel, the law firm of SGR. N.T., 9/6/2007, at 13. Judge Branca answered the question in the affirmative and explained that the communications ordinarily involved the location of things like documents. *Id.* at 13-14. According to Judge Branca, the communications between him and SGR were informative to him, "not the other way

around." *Id.* at 14. Judge Branca testified that, because he referred the case to the firm, SGR periodically updated him on the status of the case. The judge further testified that he had not had any communications with Judge Rogers concerning the case. *Id.*

Appellants' cross examination of the judge was more extensive. *Id.* at 15-49. Appellants' counsel comprehensively questioned Judge Branca regarding the communications that he had with SGR after the judge withdrew his appearance and took the bench. In addition, when counsel asked Judge Branca why SGR provided him with updates, the judge testified as follows:

> Because I had an interest in the case, I have a financial interest in the case. I have -- I'm entitled to a referral fee. And so to the extent that I'm entitled to a referral fee, I'm entitled to know something about what's happening with the case, not only for my information but for purposes of my disclosing whatever I might need to disclose if and when I get a fee.

*Id.* at 22. In terms of the amount of a fee to which he is entitled, Judge Branca explained that he "should get a third referral fee of the net proceeds as a fee." *Id.* Judge Branca maintained that he had not discussed the case with anyone other than Lomas and SGR. *Id.* at 23.

After several more questions and answers, counsel for Lomas objected, contending that the line of questioning was irrelevant given that the sole issue to which Judge Branca could testify was the amount of attorneys' fees that he billed Lomas. *Id.* at 25. A lengthy discussion then took place, during which counsel for Lomas suggested that Appellants' line of questioning was "a red herring" and that Appellants simply were attempting to impugn the reputations of SGR, Judge Branca, and the trial court. *Id.* at 27. Lomas' counsel also suggested that Appellants were attempting to divert attention away from the fact that Kravitz had fraudulently transferred millions of dollars to defraud his creditors. *Id.*

In due course, Lomas' objection was overruled, and Appellants' counsel continued to question Judge Branca about his involvement with this case after he took the bench. After Appellants completed their cross examination of Judge Branca, Lomas called two more witnesses, Kravitz and Raymond F. Dovell, a certified public accountant hired by Lomas to provide a forensic review of Kravitz and his entities.

After Lomas rested regarding attorneys' fees and punitive damages, Appellants first presented the testimony of Monica Mathews Reynolds ("Reynolds"), an associate attorney for SGR, Lomas' counsel, as if on cross. Appellants questioned her about, *inter alia*, Judge Branca's involvement in the case. When Lomas' counsel again objected, Judge Rogers asked Appellants' counsel to explain the relevance of the line of questioning. *Id.* at 104. Appellants' counsel stated, "Judge, I think if Judge Branca had any involvement in this case as to any participation in this case, I have some suspicion or am suspect in some way that this case can go forward. I may have to raise that. That's why I'm asking." *Id.* Judge Rogers allowed counsel to continue to question Reynolds. Thereafter, Appellants called Kravitz to testify in his own defense.

After the parties presented all of their evidence, Appellants' counsel requested that the record remain open to allow Appellants to have a forensic accountant examine invoices Lomas recently provided to Appellants in support of his claim for attorneys' fees. *Id.* at 120. Appellants' counsel assured Judge Rogers that Appellants would immediately notify the judge if they decided not to have a forensic accountant review the invoices or if such a review proved to be fruitless. *Id.* at 122. Over Lomas' objection, Judge Rogers granted Appellants' request, permitting them 30 days to have a forensic accountant examine the pertinent records. *Id.* at 123. Thirty days passed, and Appellants did not file anything. Further, contrary to their counsel's assurances, Appellants did not notify Judge Rogers of whether they decided not to have a forensic accountant review the invoices.

A scheduling conference took place on October 15, 2007, *i.e.*, 39 days after the last day of trial and nine days after the 30-day period expired for Appellants to explore obtaining a forensic accountant. Appellants appeared at the hearing with new counsel and presented Judge Rogers with a "Motion for Recusal, Transfer of Venue, or Assignment to Out-of-County Judge" ("Recusal Motion"). According to Appellants' Recusal Motion, on August 31, 2007, *i.e.*, just prior to the commencement of trial on attorneys' fees and punitive damages, Lomas produced for the first time redacted and unredacted billing entries for SGR. Recusal Motion at ¶ 8. On September 4, 2007, Appellants received unredacted copies of the billing entries, which indicated that attorneys from SGR had consulted with Judge Branca approximately 20 times since 2002.[3] *Id.* at ¶ 9. Appellants noted that, during his trial testimony, Judge Branca confirmed his continued involvement in the case and that he has a financial interest in the outcome of the matter. *Id.* at ¶ 10.

Although Appellants acknowledged that they were unaware of any bias or prejudice against them on the part of Judge Rogers or any other judge of the Court of Common Pleas of Montgomery County, Appellants maintained that Judge Branca's continued involvement and financial interest in the case created an "appearance of impropriety" prohibited by the Code of Judicial Conduct. *Id.* at ¶¶ 11-12. Appellants, therefore, requested that Judge Rogers enter an order recusing the entire bench of Montgomery County and either assigning the case to an out-of-county judge for purposes of a new trial on both liability and damages or transferring the case to another county for the same purposes, which effectively would render void all of the proceedings before Judge Rogers.

---

[3] Judge Branca was sworn-in during early January of 2002.

On October 18, 2007, Judge Rogers entered an order granting the Recusal Motion. However, in a motion filed on October 22, 2007, Lomas argued that the court should stay the October 18th order and allow him to respond to the Recusal Motion. According to Lomas' motion, Judge Rogers had informed the parties that Lomas would have until October 24, 2007, to respond the Recusal Motion; yet, the judge granted the Recusal Motion on October 18th, before Lomas could file his response. Motion for a Stay of the October 18, 2007 Order, 10/22/2007, at ¶¶ 1-4. Lomas then filed his response to the Recusal Motion on October 24, 2007, and Judge Rogers held a hearing regarding the issue on November 9, 2007.

Judge Rogers did not act on the recusal issue again until December 31, 2008, at which time he entered an order vacating the October 18, 2007, order. On the same day, Judge Rogers issued a separate order denying the Recusal Motion and entering partial judgment as to the liability phase of trial. The court awarded Lomas $200,601.61 in compensatory damages, plus statutory interest.

Judge Rogers authored a memorandum in support of his orders.[4] In that memorandum, the judge observed that Appellants sought an order assigning the case to an out-of-county judge or transferring the case to another county for trial on both liability and damages, despite the fact that, in his view, the case already had been fairly tried on its merits. Trial Court Memorandum, 12/31/2008, at 11. The judge highlighted that, when Appellants presented their Recusal Motion, the bifurcated trial was complete as to liability and all damage claims, and the court had already ruled on liability, which necessarily left intact the arbitrators' award of $200,601.61. Thus, the only remaining

---

[4] While we will briefly summarize this memorandum, given this Court's ultimate determination that Appellants waived the recusal issue, we will not provide a detailed analysis of the legal reasoning employed by Judge Rogers in denying the Recusal Motion.

matter to be determined was whether Lomas was entitled to attorneys' fees and punitive damages. *Id.*

Judge Rogers rejected Appellants' claim that the issues surrounding Judge Branca created an "appearance of impropriety," reasoning that the claim failed to provide the court with a legal basis upon which it could conclude that Appellants "cannot receive, have not received or will not continue to receive a fair and impartial trial in Montgomery County." *Id.* Judge Rogers pointed out that Judge Branca is not a party to the case, and he opined that "[n]o appearance of impropriety exists or is presumed to exist simply because a Judge of the Court of Common Pleas of Montgomery County has an interest in the underlying case." *Id.* at 13. Judge Rogers ended his memorandum by explaining that the record does not demonstrate prejudice or bias against Appellants; thus, the judge refused to allow Appellants to question the court's verdict.[5] *Id.*

Appellants attempted to appeal the matter at that point; however, the Superior Court quashed the appeal. Appellants then petitioned this Court, asking for a stay of the trial court proceedings and for the Court to exercise its King's Bench power to assume jurisdiction over the matter. Appellants also filed their motion for a stay in the Superior Court. The Superior Court denied the motion for a stay, and this Court denied the motion for a stay and the request that the Court exercise its King's Bench authority.

On April 29, 2011, Judge Rogers issued separate findings of fact and conclusions of law pertaining to the trial on liability and compensatory damages and the

---

[5] In his opinion filed pursuant to Pa.R.A.P. 1925(a), Judge Rogers noted his belief that Appellants waived the recusal issue by untimely raising it. *See* Trial Court Opinion, 1/15/2013, at 22 n.4 ("Moreover, in light of the fact that Counsel failed to object to the undersigned's continued involvement on September 6, 2007, and waited until October 15, 2007, to present their motion, the [c]ourt opines that the issue is waived for all intents and purposes.").

separate (bifurcated) trial on attorneys' fees and punitive damages. The court awarded Lomas a total of $1,688,379.10, which included nearly $602,000 in punitive damages. Appellants filed post-trial motions, which the trial court denied. On August 16, 2011, judgment was entered in favor of Lomas and against Appellants.

Appellants appealed to the Superior Court, raising a number of issues regarding the liability verdict and the assessment of attorneys' fees and punitive damages. The court eventually heard the matter *en banc*.[6] The court unanimously affirmed the liability verdict. However, the court evenly split regarding the propriety of the trial court's assessment of attorneys' fees and punitive damages.[7] The split centered on whether Judge Rogers erred by denying Appellants' Recusal Motion.

The opinion in support of affirming the trial court's judgment ("OISA") determined that Appellants waived the recusal issue by untimely presenting it to Judge Rogers. In reaching this determination, the OISA quoted and relied upon this Court's decisions in *In re Lokuta*, 11 A.3d 427, 437 (Pa. 2011), and *Goodheart v. Casey*, 565 A.2d 757, 763 (Pa. 1989), for the proposition that a "party seeking recusal or disqualification [is required] to raise the objection at the *earliest possible moment*, or that party will suffer the consequence of being time barred."[8] *Lomas*, 130 A.3d at 120 (emphasis in original).

---

[6] Due to Judge Allen's non-participation in the consideration of the appeal, the *en banc* panel consisted of eight judges.

[7] Because the court was equally divided in this manner, it necessarily affirmed the trial court's judgment. *See Creamer v. Twelve Common Pleas Judges*, 281 A.2d 57, 58 (Pa. 1971) (explaining that "when an appellate court is equally divided, the judgment, order or decree of the court below will be affirmed").

[8] Later in its opinion, the OISA also supported this proposition by referring to the Superior Court's opinion in *Reilly by Reilly v. SEPTA*, 479 A.2d 973 (Pa. Super. 1984), and this Court's subsequent opinion in that matter, *Reilly by Reilly v. SEPTA*, 489 A.2d 1291 (Pa. 1985). *Lomas*, 147 A.3d at 121-22.

The OISA opined that Appellants had two opportunities to seek recusal prior to when they filed their Recusal Motion. The OISA stated that Appellants first could have presented their Recusal Motion before the liability trial in January of 2007 when Judge Rogers assured the parties that he could remain fair and impartial despite Judge Branca's previous representation of Lomas. According to the OISA, the second opportunity to present the recusal claim came on September 6, 2007, immediately after Judge Branca's testimony regarding his involvement and personal interest in the case. *Id.* Instead of seeking recusal of the entire bench of Montgomery County immediately after Judge Branca's testimony (or earlier), the OISA observed, Appellants allowed the damages trial to proceed to finality and "it was not until Appellants requested a post-hearing thirty-day review of the attorneys' bills, and the thirty-day period had passed without Appellants filing any relevant documents, and not until the record had closed, that newly-retained counsel appeared and filed the recusal motion." *Id.* at 121. The OISA concluded that Appellants untimely presented the Recusal Motion and, thus, waived their recusal issue.[9]

The opinion in support of reversing the trial court's judgment ("OISR") believed that Judge Rogers erred by denying the Recusal Motion. The OISR began by providing a history of the "appearance of impropriety" standard for judicial recusal and then explaining parties' substantive right to request the recusal of a jurist. *Id.* at 133-38. The OISR also discussed the application of the "appearance of impropriety" standard to this matter and ultimately concluded that this standard required Judge Rogers to grant, in part, Appellants' Recusal Motion. According to the OISR, Judge Branca's financial interest in the case created an "appearance of impropriety," which necessitated that

---

[9] The OISA offered a gratuitous alternative conclusion that the recusal issue lacks merit. *Lomas*, 130 A.3d at 122-25.

Appellants receive a new trial, in front of an out-of-county judge, on attorneys' fees and punitive damages.

In addition, the OISR disagreed with the OISA's conclusion that Appellants waived their recusal issue by untimely presenting it to Judge Rogers. *Id.* at 145-47. The OISR took the position that Appellants could not have raised the issue any earlier than September 6, 2007, when Judge Branca testified regarding his financial interest in the outcome of the case. *Id.* at 145. Regarding the law in this area, the OISR agreed with the general proposition that a party must seek recusal at the earliest possible moment to avoid waiving the issue; however, the OISR distinguished this case from those relied upon by the Majority for this general proposition. *Id.* at 145-47.

In this regard, the OISR opined that, in *In re Lokuta*, *Goodheart*, and *Reilly*, the recusal motions were untimely filed because the moving parties presented their motions after an adverse verdict had been entered against them. Here, however, according to the OISR, Appellants filed their Recusal Motion before Judge Rogers entered a verdict. Thus, in the OISR's view, these cases do not support a conclusion that Appellants waived their recusal issue by untimely presenting it. *Id.*

In closing on this discussion, the OISR inaccurately stated that Appellants filed their Recusal Motion during the 30-day post-trial period in which Judge Rogers permitted the record to remain open to allow Appellants to determine whether they needed the services of a forensic account. *Id.* at 146. The OISR suggested that a decision to seek the recusal of an entire county bench requires counseled judgment and is distinct from common evidentiary objections that require immediate action to allow the trial court to correct an alleged error. *Id.* at 146-47. For these reasons, the OISR would have mandated that Appellants receive a new trial on attorneys' fees and punitive damages, to be presided over by an out-of-county judge.

Appellants filed a petition for allowance of appeal, which this Court granted, limited to the following issues:

> (1) Whether, as a matter of law, the Montgomery County Court of Common Pleas should have been recused from presiding over the non-jury trial due to an appearance of impropriety arising from the ongoing participation and financial interest in the litigation by a sitting member of that Court?
>
> (2) Whether, as a matter of law, an appearance of impropriety was created when a sitting member of the Montgomery County Bench personally participated in the litigation?

*Lomas v. Kravitz*, 147 A.3d 517 (Pa. 2016).

In their brief to this Court, Appellants devote a majority of their argument to the merits of the recusal issue, *i.e.*, whether Judge Branca's financial interest and continued involvement in this case constituted an "appearance of impropriety" such that the entire bench of Montgomery County should have been recused from considering the matter. Appellants' Brief at 23-38. Regarding the timing of their Recusal Motion, Appellants contend that they first learned of the full extent of Judge Branca's continued involvement in this matter on September 6, 2007; therefore, Appellants argue, they could not have presented their Recusal Motion prior to that date.[10] Appellants' Brief at 39-41.

---

[10] Lomas maintains that Appellants failed to present any discrete issue regarding waiver in their petition for allowance of appeal ("PAA"). Lomas' Brief at 18-19. Lomas suggests that, due to this oversight, Appellants essentially have waived review by this Court of the OISA's determination that they untimely presented and, therefore, waived the recusal issue. In short, Lomas insists that this Court cannot address waiver because that issue is outside of the scope of the order granting allowance of appeal. *Id.* at 18-21.

We agree with Lomas that none of the questions Appellants presented in their PAA directly implicate the issue of whether Appellants timely presented the recusal issue. PAA at 5-6. However, Appellants provided a thorough argument regarding the timing of their Recusal Motion in their PAA, which we granted as to the merits issues set forth above. *Id.* at 27-31. Moreover, the OISA found the recusal request to be untimely and (continued…)

Appellants also adopt the OISR's theory that this case is distinguishable from *In re Lokuta*, *Goodheart*, and *Reilly*, where the moving parties allegedly waited to seek recusal until after the adverse outcomes of their litigation were determined. *Id.* at 42-43. Appellants highlight that they filed their Recusal Motion years before Judge Rogers entered a final verdict in this matter. In Appellants' view, they quickly moved for recusal after Judge Branca's revealing testimony; thus, Appellants take the position that they did not waive the recusal issue. *Id.*

Lomas takes the position that, in cases involving an alleged "appearance of impropriety," waiver is particularly applicable when all of the underlying facts regarding the allegation of impropriety have been made public. Lomas' Brief at 19. According to Lomas, when a litigant is aware of all of these facts but fails to object timely, a finding of waiver is appropriate. *Id.* (citing *Goodheart*, *supra*). Lomas points out that, here, all of the facts underlying Appellants' recusal issue were known to Appellants as of when Judge Branca testified. Yet, Appellants waited 39 days to present their Recusal Motion. For these reasons, Lomas insists that Appellants untimely presented their Recusal Motion and, thus, waived the recusal issue.

This Court reviews the denial of a motion to recuse for an abuse of discretion. *See In re Lokuta*, 11 A.3d at 435 (explaining that an "appellate court presumes judges are fair and competent, and reviews the denial of a recusal motion for an abuse of

---

(…continued)
waived. Thus, in order for this Court to address the questions for which allocatur was granted, we must consider the timeliness of the Recusal Motion as a threshold issue. We further observe that the parties have briefed for this Court their positions concerning the timing of the motion and whether the alleged late filing resulted in waiver. Finally, because we ultimately conclude that the lower court correctly resolved the issue and because "this Court has the ability to affirm a valid judgment or order for any reason appearing as of record," *Commonwealth v. Flanagan*, 854 A.2d 489, 503 (Pa. 2004) (footnote omitted), we can address this question.

discretion"). "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record." *Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1284 (Pa. 2006).

From this Court's perspective, the law in this area is well settled: "The case law in this Commonwealth is clear and of long standing; it requires a party seeking recusal or disqualification to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Goodheart*, 565 A.2d at 763 (citing *Reilly by Reilly v. SEPTA*, 489 A.2d 1291 (Pa. 1985)). Despite this clear pronouncement of the law, Appellants contend that this legal proposition applies only if a litigant seeks to recuse a jurist after a final adverse verdict, despite the litigant possessing all of the necessary facts to seek recusal pre-verdict. *See* Appellants' Brief at 42-43 ("The Motion for Recusal was unquestionably not a 'hedge against a losing case' [] and the timing of this case is clearly distinguishable from the cases on which the *en banc* Majority relies, where litigants waited to move for recusal until after knowing the outcome.") (citing *In re Lokuta*, *Goodheart*, and *Reilly*, *supra*). Appellants' contention is not supported by the general statement of the law, as provided above, or by the relevant case law.

By way of example, in *Reilly*, counsel for Southeastern Pennsylvania Transportation Authority ("SEPTA") made an oral pretrial request that the trial judge recuse himself from the case. *Reilly*, 489 A.2d at 1296. Counsel alleged that the judge held a personal bias against him based upon remarks the judge made about counsel in a previous case. The trial judge invited counsel to file a written motion for recusal within five days of his oral request. *Id.* Counsel, however, filed his recusal motion eight months later, which fell on the eve of trial. *Id.* at 1296-97. The judge denied the motion. *Id.* at 1297.

SEPTA renewed its recusal motion post-trial. SEPTA based its post-trial motion to recuse on the trial judge's alleged prior hostility toward its counsel and on the additional ground that opposing counsel previously represented the trial judge as part of a class of plaintiffs who sought increased compensation for Pennsylvania trial court judges. An *en banc* panel of the trial court denied the motion as meritless. On appeal, SEPTA renewed their recusal issue in the Superior Court and added additional grounds in support thereof - grounds that SEPTA raised for the time on appeal. *Id.*

This Court eventually considered the matter. Importantly, the Court expressly stated, "In the case *sub judice*, SEPTA's recusal motions being raised in both pre and post-trial fashion require us to decide their timeliness." *Id.* at 1300. The Court first concluded that SEPTA waived its pre-trial recusal issue. We observed that SEPTA offered no excuse for its eight-month delay in presenting the issue. We further observed that SEPTA, in fact, could not excuse its delay because SEPTA had actual knowledge of the facts that formed the basis of its motion to recuse.[11] *Id.*

The Court then examined the timeliness of SEPTA's post-trial recusal motions. As to these motions, the Court began by stating, "Once the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result." *Id.* (citing *Commonwealth v. Corbin*, 291 A.2d 307 (Pa. 1972)). The Court explained that, to preserve these recusal issues for appeal, SEPTA was required to make timely, specific objections at trial and raise the issues in a post-trial motion. *Id.* In other words, recusal issues that are not presented at the earliest

---

[11] After the Court found that SEPTA had waived its pre-trial recusal issue, the Court found that the trial judge's assurances of impartiality were sufficient to justify his dismissal of the motion. *Reilly*, 489 A.2d at 1300.

possible moment but, instead, are raised for the first time post-trial, are time-barred and waived.

Thus, the law is clear. In this Commonwealth, a party must seek recusal of a jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived. *See Reilly*, *supra*; *see also Goodheart*, 565 A.2d at 763 ("Where the asserted impediment [to a jurist deciding a case] is known to the party, and that party fails to promptly direct the attention of the jurist to that fact, the objection is waived and the party may not subsequently offer the objection as a basis for invalidating the judgment."); *id.* at 764 ("In the case, *sub judice*, the facts suggesting the disqualification [of Justices of this Court] were known or should have been known when the case was called for argument and are therefore waived. This is so because the jurist, under such circumstances, may properly assume that the lack of objection by the litigants reflects the appropriateness of his or her participation."); *In re Lokuta*, 11 A.3d at 437 ("Appellant did not mention Judge Sprague's age in her pre-trial recusal motions, nor did she move to disqualify Judges Musmanno or Bucci before or during trial. She provides no reason for not raising either of these issues sooner. Because appellant failed to raise these issues at the earliest possible opportunity, they are waived.").[12]

---

[12] We reject the position of the OISR, which Appellants adopted in this appeal, that a litigant waives a recusal issue only if he raises it following an adverse verdict. Instead, when a litigant is aware of the facts underlying a recusal issue pre-verdict but waits to present the issue until after an adverse verdict, pursuant to the reasoning underlying *Reilly*, *supra*, the litigant waives the issue on two grounds: the failure to present the issue at the earliest possible moment, and the failure to preserve the issue at trial by lodging a timely, specific objection regarding recusal.

We nonetheless believe it is worth noting that, when Appellants filed their Recusal Motion, Judge Rogers already had entered an adverse verdict against them regarding liability, which necessarily involved a negative decision concerning compensatory (continued…)

As to the matter currently before the Court, we agree with Appellants that they did not know of all of the facts underlying their recusal issue until Judge Branca testified on September 6, 2007. However, Appellants clearly were aware of all of the facts underlying the recusal issue on that date. Indeed, all of the facts Appellants averred in in their Recusal Motion, in support of their belief that recusal was appropriate, were disclosed on or before September 6, 2007, during the judge's testimony.

Moreover, as we mentioned above, during Reynolds' September 6, 2007, trial testimony, Judge Rogers asked Appellants' counsel to explain why he was questioning Reynolds about Judge Branca's involvement in this case. N.T., 9/6/2007, at 104. Appellants' counsel responded, "Judge, I think if Judge Branca had any involvement in this case as to any participation in this case, I have some suspicion or am suspect in some way that this case can go forward. I may have to raise that. That's why I'm asking." *Id.* Thus, despite Appellants' knowledge of all of the facts underlying their eventual recusal issue after Judge Branca testified on September 6th and their September 6th announcement that they may need to raise an issue regarding Judge Branca's participation in this matter, without even seeking recusal, Appellants allowed: additional witnesses to testify at the trial on damages; the evidentiary portion of that trial to conclude; the 30-day time period, which they requested to allow for forensic review of records, to expire; and an additional nine days to pass following the expiration of that 30-day time period. It was not until after all of these events that Appellants finally filed a Recusal Motion on October 15, 2007.

---

(…continued)

damages. Moreover, when Appellants presented their Recusal Motion, for all intents and purposes, the die was cast as to Lomas' eligibility to receive attorneys' fees and punitive damages. Thus, the OISR's attempt at distinguishing the relevant cases from this matter appears to be invalid.

We need not decide the exact moment in which Appellants were required to present the recusal issue to avoid waiver. However, it is obvious that October 15, 2007, was not "the earliest possible moment" that Appellants could have raised their objections regarding recusal, as all of the facts underlying the recusal issue were known to Appellants after Judge Branca testified on September 6, 2007. Accordingly, we hold that Appellants failed to file the Recusal Motion in a timely manner and, therefore, waived the issue.[13, 14] We, thus, affirm the judgment of the Superior Court.

Justices Todd, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a dissenting opinion.

Justices Donohue and Wecht did not participate in the consideration or decision of this case.

---

[13] This conclusion obviates the need for the Court to examine whether the recusal issue has merit, as any such discussion would be pure *dicta*.

[14] In his Dissenting Opinion, Chief Justice Saylor states that he would adopt a four-factor test, utilized by some federal courts, to assess whether a party timely sought recusal. The Dissent then retroactively applies that test to the facts of this case, concluding that Appellants timely filed their Recusal Motion. Respectfully, we are circumspect to adopt and apply a new test in this case, particularly when the parties offer no advocacy in this regard. In our view, this matter requires the Court to determine whether Appellants waived their recusal claim pursuant to current Pennsylvania precedent, and we answer that question in the affirmative.